## KUNGLIG JARNVAGSSTYRELSEN v. DEXTER & CARPENTER, Inc., et al.

### (District Court, S. D. New York. May 21, 1924.)

**Customs and usages ⬡⟶5—Plea of custom held good to validate tender of insurance under contract.**

Where defendant contracted to sell to plaintiff a quantity of coal, to be delivered in New York for shipment to Sweden, at a stated price "c. i. f.," payment to be made by a New York bank from an established credit against shipping documents, tender of a certificate of insurance issued by a New York broker calling for a policy issued by London underwriters may be good, where in conformity with a universal custom in the United States giving the seller the option in such cases of New York or London insurance, and if the latter is procured authorizing the use of such broker's certificates.

At Law. Action in special assumpsit by the Kunglig Jarnvagsstyrelsen, also known as The Royal Administration of the Swedish State Railways, against Dexter & Carpenter, Inc., and others. On demurrer to plea in confession and avoidance. Overruled.

Enos Throop Geer, of New York City, for the demurrer.
Wharton Poor, of New York City, opposed.

LEARNED HAND, District Judge. The declaration is for breach of a contract for the sale of coal. It alleges, stripped of irrelevant matter, that the defendant sold and the plaintiff bought a cargo of coal at $31.90 per ton, "said price including cost, insurance and freight upon said coal prepaid to the port of Malmo," the price "to be paid against delivery in the city of New York of shipping documents, including insurance policies, bills of lading, and invoice"; that the plaintiff established a letter of credit with a New York bank, which it instructed to pay the price on receipt of the invoice, shipping documents, and "policy or policies of insurance"; that the bank, contrary to instructions, paid the purchase price without demanding policies of insurance, and received in lieu thereof only a "certificate of insurance," declaring under the hand of the defendant's insurance broker that insurance had been underwritten in London for account of the defendant; that under the law of England such a certificate was not a policy of insurance within the meaning of such a contract of sale; that the coal was lost at sea, and that the plaintiff has paid the bank; that the insurance broker had not taken out any insurance when the certificate of insurance was delivered to the bank.

The plea makes profert of the contract, which was parol, and which provided for the sale of 150,000 tons of coal at various prices for various points of delivery, in all cases "c. i. f." (the letters being so written), of which 30,000 were to be delivered at Malmo. It alleged that the cargo in question was shipped under the contract; that it was a universal custom in the United States, in cases of "c. i. f." sales, for the seller to have the option of New York or London insurance; that in case of London insurance the seller might procure it through an American broker, who would in turn through a London broker secure the actual policy, who cabled back when he had fixed it; that on receipt

of such a cable the New York broker would issue such a certificate of insurance as the plea made profert of; that this custom was followed in the case at bar, the defendant paid the New York broker, indorsed the certificate, and the bank accepted the papers on tender. The certificate of insurance in question recited that insurance of necessary amount had been issued by "London underwriters" for the account of the defendant on the shipment in question; that policies of London underwriters would be exchanged on demand for the certificate as soon as practicable; that the insurance was placed subject in all respects to English laws and customs governing marine and war risk insurance. Various conditions applicable specifically to coal cargoes were contained in an annexed rider.

The purpose of the demurrer is to secure a ruling consonant with those recent English cases under which such a certificate would not be a valid tender of insurance, and under which apparently, even after acceptance, substantial damages may be recovered. Under the declaration at bar it may well be argued that only nominal damages can in any aspect be recovered, without some allegation that the plaintiff has been unable to collect from the London underwriters under the certificate of insurance. That is quite another question from whether the tender could have been refused and damages recovered for the breach. However, since the tender, if bad, was a breach, I suppose that nominal damages, at least, were recoverable, and, if so, the declaration is not demurrable. Hence the demurrer raises the validity of the plea.

Before reaching this question, there is one preliminary matter, to wit, whether the acceptance by the bank of the certificate without reservation still left it within the power of the plaintiff to treat it as an insufficient tender. The bank was the plaintiff's agent for that purpose, and it is a matter of no moment to the defendant if it disobeyed its instructions. That question I mention only to pass, assuming merely for argument that, though acceptance would bar the right to reject, it did not prevent an action for damages on breach of the promise to deliver insurance.

Thus I am brought squarely to the question whether, if there be a uniform usage in this country to treat such certificates as performance of a contract "c. i. f.," the tender was good. I must start by observing that the plea varies from the declaration, the latter alleging that the contract stipulated for "policies of insurance," while the contract contained only the words:

"We offer * * * the quantity indicated herein at the following prices: * * * $31.50 per gross ton c. i. f. Malmo."

On demurrer the plea controls, and the case is at once distinguished from the only case in the English Court of Appeal, and that last decided in order of time, Donald H. Scott & Co. v. Barclay's Bank, [1923] 2 K. B. 1. There action was brought on by the seller on a letter of credit, upon the bank's refusal to accept the tender of a certificate of insurance completer in detail than that at bar, but still referring to the policy for part of the contract. The letter of credit had prescribed among the necessary documents an "approved insurance policy." Bankes, Scrutton, and Atkin, L. JJ., held that, as the buyer must look

to another policy to ascertain all the terms of insurance, the tender was bad. There was no proof of usage, and the certificate did not declare that a specific policy had been taken out on the cargo in suit, but it was merely a coverage slip on a floating policy. However it specifically provided against any broker's lien for premiums paid.

In Diamond, etc., Co. v. Fl. Bourgeois, [1921] 3 K. B. 443, the next most recent case, McCardie, J., had before him an action on the refusal by the buyer to accept under a contract of sale "c. i. f." A certificate of insurance was tendered similar to that in Scott v. Barclay's Bank, supra, which the learned judge held insufficient. His reasons were three: First, the same as that later adopted by the Court of Appeal; second, that the certificate was not a classifiable legal document at all; and, third, that it was very doubtful whether such a certificate would support an action under the British statute. McCardie, J., expressed a faint doubt whether a uniform usage might not have made good such a tender.

In Wilson, etc., Co. v. Belgian, etc., Co., [1920] 2 K. B. 1, Bailhache, J., also had a case of suit upon the buyer's refusal under a usual "c. i. f." contract. There the tender had been of a broker's coverage note. This was not identical in form with the certificate of insurance in the two later cases, but so far as I can see was the same in substance, except for the absence of a provision relating to the broker's lien for premiums, a circumstance on which Bailhache, J., in part relied in his judgment. There was some proof of custom, but the witnesses could recall no instance where such a note had been forced upon an unwilling buyer, a defect that, with deference, it seems to me was scarcely of moment, if none had never been refused. Bailhache, J., in declaring that the certificate was not a good tender of insurance, said that he did not mean to include in his decision American certificates of insurance, a reservation which, however, the two cases already cited declined to accept. The custom he thought insufficiently proved for the reason given. How far a custom might have controlled does not definitely appear.

The first case was also a judgment of McCardie, J., in Manbre Saccharine Co. v. Corn Prod. Co. Ld., [1919] 1 K. B. 188. The suit was by the buyer, who had accepted the documents under a "c. i. f." contract, one of which was a letter of the seller stating that the goods were insured by it under a general policy covering these and more, and in substance that the policy was pro tanto for the benefit of the buyer. Having paid, the buyer sued for breach of contract as in the case at bar. McCardie, J., thought that custom might have made such a tender good, but found none such. It did not appear whether the buyer's efforts, if any, to collect on the insurance, had proved vain, but damages in full were allowed on the theory that only a separate policy of insurance, uncomplicated by sharing with other goods, was a proper tender.

Such is the law at present in England, so far as I have found, and it is clear that no case is like that at bar. The contract did not here prescribe a policy of insurance, but left the obligations to be determined from the letters "c. i. f." There was a specific London policy underwritten on this cargo alone; the usage in New York was universal to

accept such certificates as performance; the policy as underwritten is valid under the laws of England, where it was made. Candidly, it seems to me probable that a tender even under all these circumstances would at present be held bad in England, but any conclusion is as yet doubtful, and the results so far have been reluctantly reached. However that may be, and much as I should hesitate to diverge from the settled law of so great a commercial country, it seems to me, in the language of a great English judge:

"It is the business of courts reasonably so to shape their rules of evidence as to make them suitable to the habits of mankind." Humfrey v. Dale, 7 E. & B. 266, 278.

When a usage of this kind has become uniform in an actively commercial community, that should be warrant enough for supposing that it answers the needs of those who are dealing upon the faith of it. I cannot see why judges should not hold men to understandings which are the tacit presupposition on which they deal. From Lord Holt's time on they have generally in one way or the other been forced in the end to yield to the more flexible practices of commercial usage. So far as I know, the results have been generally acceptable to every one, once they were settled.

The objections to this specific usage are that it is unreasonable, and that it contradicts the contract. The first objection may be divided into two parts: First, that it compels the buyer to take insurance the full terms of which he has no opportunity to see; and, second, that it exposes him to a broker's lien. As to the first, it would be formidable if the contract prescribed the terms of the policy to be delivered, but it does not. Any policy would do which was adequate marine protection within tolerable limits. The certificate at bar contains some of the terms of the policy actually underwritten, and for the balance refers to "English law and customs." Now it is quite true that such a reference leaves much uncertain, but can any one say that it is less certain than the permissible latitude in the provisions of a policy which the seller might tender and the buyer must accept? That law is a standard of reference as definite as the contract prescribed, and I can see no ground for declaring a usage unreasonable which substituted one for the other. Certainly the situation is toto cœlo different from such a tender under a contract which stipulated for the delivery of an approved policy of insurance.

The other supposed unreasonable feature of the usage is that there might be a broker's lien upon the policy for premiums. The New York broker could have none, because the lien is possessory (Spring v. So. Car. Ins. Co., 8 Wheat. 268, 285, 5 L. Ed. 614; Rose v. Shinasi, 168 App. Div. 93, 153 N. Y. Supp. 734), and he has given up the certificate. The London broker might indeed have a lien for the premium paid by him, even though the seller paid the New York broker (Fisher v. Smith, L. R. 4 App. Cas. 1); but he would have no general lien (Manss v. Henderson, 1 East, 335), because he knew that the policy was for a third person. Therefore the objection comes to this: Though the seller pays the premium to the New York broker, a usage is unreasonable which exposes the buyer to the possibility of a lien for that premium in

favor of the London broker, whom the New York broker does not pay. In the first place, is it altogether clear that the London broker could hold his lien, if he knew that the certificate was to pass to a third person and would represent the policy which he retained? Assuming that he could, and that the usage leaves the buyer exposed to such a risk, it does not on that account appear to me to be beyond reasonable limits because of that possible injustice. Usages are never of importance, unless they modify rights which would otherwise result. The fact that the usage imposes a risk upon the buyer, which he would not incur if a policy were delivered, is not, I think, so vital to the substance of the contract that it may not be interpolated into the contract by implication.

This raises the general question of how far the usage contradicts the language of the contract. "Insurance" certainly does not literally mean a "policy of insurance." When the buyer has a policy of insurance awaiting his demand and covering the loss, and that alone, why should the situation be thought to contradict a contract giving him only "insurance"? Is it less insurance because, though he has received symbolic delivery of the policy and actual delivery of the document which controls its production, he has not the policy itself? I must own that I cannot see why.

But the conventional statement of the rule is really not susceptible of consistent application anyway, and has been recognized not to be by the best writers. Words mean what the parties who use them want them to mean, and it makes no difference how widely their meaning in a special case varies from their common meaning. It is true that, in deciding how far any specific usage can be supposed to vary that normal meaning, the extent to which that meaning is set awry ought to be an important consideration, but that is all. At least that, I am glad to say, is the authoritative rule in this court. Eames v. Claflin (C. C. A. 2) 239 Fed. 631, 152 C. C. A. 465; Nicoll v. Pittsvein Coal Co. (C. C. A. 2) 269 Fed. 968.

There appear to be no American cases on the point here at bar, but Vietor v. National City Bank, 200 App. Div. 557, 193 N. Y. Supp. 868, 206 App. Div. 664, 199 N. Y. S. 955, and 237 N. Y. 538, 143 N. E. 733, is not far away. There the New York courts went much further in allowing a usage to wrest common terms from their common meaning. The issue was whether a receipt for water carriage, signed by a transportation company, could by usage fulfill the definition of a bill of lading. The seller, presenting such a document, was held to make a good tender.

The demurrer is overruled.