(No. 42019.—

CHICAGO BRIDGE & IRON COMPANY, Appellant, *vs.* RELIANCE INSURANCE COMPANY, Appellee.

*Opinion filed Oct. 7, 1970.—Modified on denial of rehearing,*
*December 3, 1970.*

WINSTON, STRAWN, SMITH & PATTERSON, of Chicago, (CALVIN SAWYIER, RICHARD A. BARTON, ROBERT G. LANE, CHARLES O. ZIEMER, of counsel,) for appellant.

DENT, HAMPTON & DOTEN, of Chicago, (JOHN P. HAMPTON, LOUIS L. DENT, and EDWARD P. MCNEELA, of counsel,) for appellee.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

This action by Chicago Bridge & Iron Company stems from the construction of a water tower for the Chicago Transit Authority. The general contractor was Taheny Brothers Company, and the plaintiff was a subcontractor. The defendant, Reliance Insurance Company, provided a surety bond for Taheny Brothers. When the plaintiff was not paid for labor and materials which it had supplied, it instituted this action against Taheny Brothers on its contract and against Reliance Insurance Company on its bond. The trial court dismissed the count of the complaint which sought recovery from Reliance on the ground that the plaintiff had executed a lien waiver which barred recovery against the bonding company. The trial court also found that there was no just reason for delaying enforcement or

appeal. The Appellate Court, First District, affirmed (105 Ill. App. 2d 91), and we granted leave to appeal.

On April 12, 1965, Taheny Brothers Company entered into a general contract with the Chicago Transit Authority for construction work which included the furnishing and installation of a 75,000 gallon water tank. The general contract and the statute (Ill. Rev. Stat. 1965, ch. 29, par. 15) required Taheny Brothers to give a performance and payment bond, and on April 12, 1965, Taheny Brothers, as principal, executed a bond with the Reliance Insurance Company as surety in the amount of $1,264,000.

On April 26, 1965, the plaintiff entered into a subcontract with Taheny under which the plaintiff agreed to construct and install the water tank. On December 8, 1965, the plaintiff had completed more than 95% of its work and submitted an invoice to Taheny Brothers requesting a partial payment of $30,200.50. The subcontract provided that partial payments were to be made "not later than five days after the date payment has been made by the Owner to the Contractor for such work." The general contract required Taheny to deliver a contractor's affidavit and waivers of lien to date to the CTA "prior to or at the time of receiving partial payments." Taheny Brothers requested that the plaintiff first execute a waiver of its lien on public funds, so that Taheny could comply with the requirement of the general contract and receive a partial payment from the CTA. The plaintiff executed the waiver in contemplation of payment, and Taheny took it to CTA and received a partial payment but never made payment over to the plaintiff. On April 1, 1966, CTA declared Taheny Brothers in default under the principal contract, and the plaintiff filed this action.

In the count of its complaint which is now before us, the plaintiff sought recovery from the surety on three grounds. First, it alleged that the very purpose of the payment bond was to guarantee against the default of the gen-

eral contractor in failing to pay over construction funds to the subcontractors. Second, it alleged that it was the custom in the industry that subcontractors issue lien waivers before receiving payment, that the defendant knew of this custom, and therefore the plaintiff's release of its lien did not prejudice the defendant. Third, it alleged that the payment bond statute (Ill. Rev. Stat. 1965, ch. 29, par. 15) independently makes the surety liable to the plaintiff even though the plaintiff may have voluntarily released security and thereby prejudiced the defendant.

The defendant relies basically on the fact that the plaintiff executed a partial release of lien which enabled Taheny Brothers to obtain payment from CTA in the amount of $30,200.50, and on the general principle of surety law that a release of security by a creditor without the consent of the surety releases the surety *pro tanto*.

The plaintiff's first argument is that "the payment bond * * * is needed protection only when the subcontractor has, by furnishing lien waivers, permitted the general contractor to withdraw from the total municipal construction fund the money allocable to the particular subcontract. Otherwise, if the lien waivers of the subcontractor are not furnished to the municipality by the general contractor, the municipality is not obligated under the General Contract conditions to make payment and will not make payment; and the construction fund then stands intact for the subcontractor's share of the over-all contract amount."

We are not convinced by this argument, for there are other risks which the payment bond was intended to cover. As the defendant points out, "in many cases, because the contract price is inadequate or because the contractor is incompetent the contract funds will be inadequate to pay the contractor's obligations incurred in performance of the contract." See Campbell, The Protection of Laborers and Materialmen Under Construction Bonds*—Part I, 3 U. Chi. L. Rev. 1, 7 (1935).

It is a well-settled principle of surety law that if a creditor releases collateral security without the consent of the surety, the surety is *pro tanto* released from its obligation. (See Restatement of Security, sec. 132; *Alexander Lumber Co.* v. *Aetna Co.* (1921), 296 Ill. 500; *Pittsburgh Steel Co.* v. *Standard Accident Ins. Co.* (DCSC 1944), 55 F. Supp. 36; *Wisconsin Electric Sales Co.* v. *Langdon* (1926), 191 Wis. 645, 211 N.W. 670; *Crane Co.* v. *Park Construction Co.* (Mass. 1969), 247 N.E.2d 591; Annotation, False receipts or the like as estopping materialmen or laborers from recovering on public work bond, 39 A.L.R. 2d 1104.) As the plaintiff points out, if Taheny had paid the money it received from CTA over to the plaintiff, this loss would not have occurred.

But it is equally clear that if the plaintiff had not delivered lien waivers to Taheny, no loss would have occurred. Indeed, it is precisely because of a possible default that payment to the principal is conditioned upon production by him of some kind of assurance that he has paid his subcontractors. "It is the obligation of the creditor to protect the underlying security for the surety and if that security is dissipated without the consent of the surety, the creditor must bear the loss." (*New Amsterdam Casualty Co.* v. *F. Redondo & Co.* (Texas 1942), 158 S.W.2d 334.) We think, therefore, that the decision in *Board of Education* v. *Hartford Accident and Indemnity Co.* (1965), 60 Ill. App. 2d 320, upon which the Appellate Court relied, is correct on its facts. The plaintiff has cited no case, and we have found none, which allows recovery against a nonconsenting surety by a supplier who has given a waiver which allowed the principal to obtain payment.

*Prepakt Concrete Co.* v. *Fidelity and Deposit Co.* (7th cir. 1968), 393 F.2d 187, upon which the plaintiff heavily relies, does not support its position. In that case Prepakt was a sub-subcontractor to Mid-Continent Construction Company which was a subcontractor to Goethe Building Corpora-

tion, the prime contractor. The defendant, Fidelity and Deposit Company, furnished a bond for Mid-Continent. Continental Illinois National Bank was the owner of the building being constructed. Prepakt, at Mid-Continent's request, delivered a lien waiver to Goethe prior to being paid. The waiver was accompanied by a letter explaining that Prepakt had not been paid. Upon receipt of the waiver and letter, Goethe made a payment of $30,000 to Mid-Continent. When Prepakt was not paid it brought suit against Mid-Continent and Fidelity and also sought to foreclose its mechanics lien against Continental and Goethe.

The court determined that the waiver "was effective to waive the lien 'on the premises' * * * but did not purport to release the statutory lien on moneys due under the contract." The court then went on to say that "[w]hen Goethe paid the $30,000 it knew Prepakt had not been paid and that the waiver's statement that Prepakt had received the $25,000 was not true. It also knew that the waiver was not an effective release of the lien on the funds due under the contract." The decision in that case is therefore not pertinent here, where there is no question but that the plaintiff effectively waived its lien on the public funds available for the payment of its claim.

Nor can we accept the plaintiff's argument that the payment bond statute was intended to guarantee payment to subcontractors like the plaintiff regardless of their own conduct. The pertinent section of the statute provides:

"Each such bond shall be deemed to contain the following provisions whether such provisions be inserted in such bond or not:

'The principal and sureties on this bond agree to pay all persons, firms and corporations having contracts with the principal or with subcontractors, all just claims due them under the provisions of such contracts for

labor performed or materials furnished, in the performance of the contract on account of which this bond is given, when such claims are not satisfied out of the contract price of the contract on account of which this bond is given, after final settlement between the officer, board, commission or agent of the State or of any political subdivision thereof and the principal has been made.' " Ill. Rev. Stat. 1965, ch. 29, par. 15.

The Appellate Court, relying on the decision in *Board of Education* v. *Hartford Accident and Indemnity Co.* (1965), 60 Ill. App. 2d 320, concluded that "the statute does not contemplate liability in the case where a claimant has voluntarily prejudiced the rights of the surety." The court in *Hartford* reasoned that the statute required payment only of just claims, and that a claimant who has voluntarily prejudiced the rights of a surety does not have a just claim within the meaning of the statute.

The plaintiff contends that this is an erroneous construction of the statute. It argues that the justness of the subcontractor's claim against the surety is irrelevant since the statute speaks only of just claims due under the contract with the general contractor; and that there is no question of the justness of the plaintiff's claim against the general contractor. We think the plaintiff reads the statute too narrowly.

In *Dixie Lumber Co.* v. *Trinity Universal Insurance Co.*, 148 S.2d 924 (La. App. 1963) the plaintiff accepted a post-dated check in payment of its account from the general contractor and then wrote a letter to the financier stating that it had been paid. Upon receipt of the letter, the financier paid the general contractor. When the check was dishonored the plaintiff brought suit against the surety, and the surety interposed a plea of estoppel. The plaintiff contended that a State statute which provided that a surety on a contractor's

bond could only raise those defenses which the contractor himself might make prohibited the defense of estoppel. The court found for the surety saying " 'We are therefore of the opinion that the clause in the statute providing that the surety shall be confined to such defenses as the contractor himself might make, must be taken with the limitation, that the party invoking the clause must himself have done nothing to prejudice the right of the surety, since it is a well settled maxim of law that no man may profit by his own wrong.' " It has also been held that the Miller Act, which is the Federal counterpart of our statute, does not prevent a claim of estoppel from being raised, although it was intended, as was the Illinois statute, to be remedial. See, *e.g., United States* v. *James Stewart Co.* (9th cir. 1964), 336 F.2d 777.

The plaintiff seems to regard the lien waiver which it executed as an act entirely devoid of consequences. But the plaintiff was entitled to have its claim satisfied out of the contract price, and if its lien waiver was not intended as a representation that its claim had been satisfied, that waiver certainly put an end to its right to be paid from the funds due to Taheny from CTA. There is no indication in the statute that the legislature intended to do away with the long-standing equitable principle regarding release of underlying security. We disagree with the plaintiff's contention that the amendment of 1941, which added the section involved here, was intended to do away with this principle. Rather it was enacted to assure that bonds taken would extend third-party benefits to all labor and material suppliers. See *Laclede Steel Co.* v. *Hecker-Moon Co.* (1935), 279 Ill. App. 295; *McWane Cast Iron Pipe Co.* v. *Aetna Casualty and Surety Co.* (1954), 3 Ill. App. 2d 399.

We come then to the plaintiff's argument that there is a custom in the building industry in Chicago for subcontractors to give lien waivers to the general contractor before the subcontractor receives payment, and that since the

surety knew of the custom, the action of the plaintiff did not prejudice the rights of the surety. The plaintiff alleges that the provisions of the general contract and subcontract, when read together, take cognizance of the industry custom. The argument runs like this. By the terms of the subcontract the plaintiff is not entitled to payment from Taheny Brothers until 5 days after Taheny is paid by CTA. But Taheny is not entitled to payment from CTA until it delivers lien waivers to CTA which Taheny must first obtain from the plaintiff and other subcontractors. Thus, unless the plaintiff delivered lien waivers to Taheny to allow it to be paid by CTA, the time within which payment to the plaintiff is required by the subcontract would never arrive. The plaintiff explains this contradiction by the custom in the industry that the subcontractor gives lien waivers to the general contractor who uses them to obtain payment from the owner. The general contractor then uses the money he has received to pay the subcontractors.

The defendant says that the provision in the general contract requiring the general contractor to deliver lien waivers before receiving payment should not be read as meaning that only sham waivers are required. The more reasonable assumption, it argues, is that people engaged in a business have the capital required to carry on that business. Accordingly, the defendant interprets the provision in the subcontract stating that progress payments will be paid not later than five days after Taheny has received payment from CTA as "a contractual fixing of a date beyond which payment will not be delayed." The defendant points out that nothing prohibited the plaintiff from requiring payment before it delivered the waiver to Taheny.

We think the plaintiff should have the opportunity to prove that the claimed custom existed in the industry and that his interpretation of the contracts is correct. What we are called upon to do here is interpret the meaning of a contract. The major inquiry in that analysis is to attempt

to find the intent of the parties at the time of execution. We are attempting here to determine whether or not the surety bond was intended to cover the risk that the general contractor might be dishonest. If the plaintiff can prove his allegation as to a custom in the industry that the subcontractor delivers lien waivers before he is paid, and that the defendant knew of this practice or is estopped to deny that he knew, (See *DeStefano* v. *Assoc. Fruit Co.* (1925), 318 Ill. 345; *Katz* v. *Brooks* (1965), 65 Ill. App. 2d 155) then the general principle as to release of collateral security would be inapplicable since the "lien" could not possibly have been contemplated by the surety as security against an action such as the general contractor took here.

The defendant cites numerous cases which invoke the doctrine that a custom or usage may not be used to abrogate an established rule of law, and argues that even if there was a custom of providing lien waivers before payment, it cannot abrogate the established rule of law that the release of security by a creditor without the consent of the surety releases the surety pro tanto. The doctrine that a custom or usage cannot abrogate an established rule of law, if read literally, would prevent a custom or usage from ever being admitted since the very purpose of admitting a custom is to prevent the application of a rule of law or to apply a different rule than would ordinarily be applied absent the custom. (See Williston Section 651.) Because of this susceptibility to overbroad interpretation, however, the cases attempting to apply the rule cannot be explained by any consistent pattern.

Proof of custom or usage is intended as an aid to the interpretation of the intent of the parties at the time the contract was made. (*Bissell* v. *Ryan* (1860), 23 Ill. 517 (orig. ed. 566); *Kelly* v. *Carroll* (1921), 223 Ill. App. 309; U.C.C. secs. 1-201(3).) If a usage exists in a particular trade of which both parties either had notice or should have had notice, it is only just and proper that their contract

should be interpreted in view of the trade practice. (See *Kunglig Jarnvagsstyrelsen* v. *Dexter & Carpenter, Inc.* (1924), 299 F. 991.) The parties should not be allowed to violate those rules of law, however, which have viability independent of the intention of the parties. Thus we think the proper meaning of the rule that custom or usage cannot be invoked to abrogate an established rule of law is that a custom or usage can override a contrary rule of law if an express agreement by the parties would have eliminated the application of the rule, but if the rule could not have been dismissed even by a contrary express agreement, then trade usage will not be allowed to override the rule. (See (5) Williston on Contracts Sec. 655; Restatement of Contracts § 249.) Thus in *Ozier* v. *Haines* (1952), 411 Ill. 160 and *Entwhistle* v. *Henke* (1904), 211 Ill. 273, both cited by the defendant, the plaintiff attempted to rely upon custom to abrogate the requirement of the Statute of Frauds. Since even an express contrary agreement could not override the application of the statute, the usage was not allowed to prevail.

The dispute narrows down to whether the rule that security released by the creditor releases the surety is that type of rule which could not be overridden by contrary agreement. If it is, then the plaintiff's claim of custom is irrelevant. A majority of the court thinks that it is not such a rule. Surety contracts are often written without collateral security, and as pointed out earlier, the rule is subject to the qualification that the surety must not consent to the release. (*First National Bank of Alex* v. *Godwin* (1935), 173 Okla. 169, 47 P.2d 116; *Wattenbarger* v. *City of Vinita* (1934), 170 Okla. 222, 40 P.2d 6; *Scott* v. *Montgomery County Bank* (1923), 158 Ark. 644, 250 S.W. 902; compare *Gardiner* v. *Harback* (1859), 21 Ill. 129; *Johnston* v. *Paltzer* (1902), 100 Ill. App. 171.) Accordingly, if the plaintiff can prove that a usage existed for lien waivers to be given before payment has been made, a majority of the court is of the opinion that such a usage is not contrary to public policy

and amounts to a consent by the surety for release of the collateral security.

My own view is to the contrary because the function that the lien waiver serves is exactly that which would be served by a representation that the plaintiff had been paid by Taheny Brothers. Such a false representation could serve only to deceive someone—if not the CTA then someone else. The potential for deceit that is inherent in the alleged custom on which the plaintiff relies is too great to permit its recognition to defeat an established rule of law.

In accordance with the view of a majority of the court, the judgments of the appellate and circuit courts are reversed, and the cause is remanded to the circuit court of Cook County.

*Reversed and remanded.*